SOUTHWESTERN DISTILLED PRODUCTS, INC., *v.* STATE, EX REL. BUTT, PROSECUTING ATTORNEY.

4-6141                                        160 S. W. 2d 208

Opinion delivered October 20, 1941.

*Brickhouse & Brickhouse* and *Vol T. Lindsey,* for appellant.

*John K. Butt,* for appellee.

*Pryor & Pryor* and *Owens, Ehrman & McHaney,* amici curiae.

AL G. MEEHAN, Special Judge. This appeal is the culmination of protracted litigation involving taxes claimed to be due by the appellant, Southwestern Distilled Products, Inc., to the State.

The judgment, from which is this appeal, contains findings of facts which disclose the questions presented for our decision, from which we copy as follows.: Between the dates of April 1, 1939, and October 18, 1939, appellant handled, offered for sale, and sold, 277,427.15 proof gallons of alcoholic and spirituous liquors. Of these 417 gallons were sold to rectifiers in this state. 1,695 gallons were sold to wholesale dealers holding legal permits in this state. The remainder was sold at both wholesale and retail to buyers holding no legal permits issued in this state, but who purchased the liquors to

export from this state, and who did export the same from this state, none of it being sold by the purchasers in this state or otherwise handled in this state except such handling as was incident to loading it into the truck or automobile in which it was carried from this state. No sales were made of a smaller quantity than a case, which contained 3 gallons. None of it was shipped out of the state by any common carrier, each purchaser having furnished his own transportation facilities.

None of the liquor had on the containers thereof strip stamps denoting the payment of any liquor tax to the state, but all of it was blended and rectified liquor. While there was no strip tax on the containers of the liquors, appellant has paid all taxes demanded by the Revenue Commissioner of this state.

Appellant operated under a rectifier's permit, for which it had paid the fee ($1,500) required by the law of this state.

The Auditorial Department of the state had made regular audits of the business of appellant, from which it appeared that appellant had paid all taxes demanded by the Commissioner of Revenues, on the basis of 5 cents per proof gallon.

There is involved here no question as to whether this tax should have been paid on the wine gallon or on the proof gallon basis, and we do not consider that question.

The court below declared the law to be that, except on the liquor sold to wholesalers and other rectifiers, on which no additional tax was due or demanded, the tax should be computed at $1.12 per gallon, or $3.36 per case of 3 gallons, and not on the basis of 5 cents per gallon, and the tax was so computed, after allowing credit for the 5 cents tax per gallon previously paid. Upon this finding, judgment was rendered against appellant for $294,495.16.

The appeal presents the question of the construction of Acts 108 and 109 of the 1935 Session of the General Assembly. These acts were both approved March 16, 1935, and each contained the emergency clause. They

must, therefore, be read together in the construction of either.

Generally speaking, the first of these—Act 108 (commonly referred to as the Thorne Act)—provides for the issuance of permits and licenses for the manufacture, sale, transportation, possession, or other disposition of intoxicating liquors; while the second act— No. 109 (commonly referred to as the Dillon Act)— provides for the imposition and collection of excise taxes on the business of manufacturing, selling and transporting intoxicating liquors.

These acts legalized and regulated the sale of intoxicating liquors, and, having done so, provision was made for manufacturing and rectifying them in this state. A tax was imposed upon wholesalers of $1,000 per annum, and upon rectifiers of $1,500 for the same period of time, this tax being for the privilege of doing business as a manufacturer or a rectifier respectively.

The Commissioner of Revenues was required to formulate regulations governing the liquor traffic, pursuant to which requirement various regulations were promulgated from time to time. The most important of these applicable to the issues here involved was "Supplemental Regulation No. 25 to Regulation No. 1, promulgated under the authority of Act 108 of 1935, pertaining to rectifiers."

This supplemental regulation required all rectifiers to obtain a special or rectifier's permit, and this appellant did, paying therefor the sum of $1,500, as required by law.

It was required in Supplemental Regulation No. 25, *supra,* that all liquor must be transported into the state by common carrier, with a permit accompanying each shipment. This requirement was not imposed as to liquor exported from the state, and the regulations are silent, as also are the Acts 108 and 109, as to how or in what manner liquor may be exported from the state.

Liquors received by rectifiers, whether in bulk or in bottles in case lots to be rectified, blended, or mixed,

are permitted to be shipped into the state tax free. This regulation was based upon § 6 of Act 109, which so provides.

It was further ordered that "All liquors rectified, blended and mixed, whether sold to other rectifiers, wholesale dealers, or sold to dealers outside the state, must be reported to the Commissioner of Revenues on or before the tenth of each month and tax paid at the rate of five cents per gallon." Authority for this regulation, including the amount of tax to be paid, is found in § 4 of Act 109.

Sub-regulation No. 5 provided that "Rectifiers may sell only to wholesalers, other rectifiers, and export outside the state." This regulation was based upon paragraph (b) of § 4 of Act 108, which provides that "Any rectifier may, under such rules as may be adopted by the Commissioner of Revenues, sell, deliver, or transport only to (1) wholesalers; (2) other rectifiers; (3) export out of the state."

Rectifiers were thus allowed only three classes of customers: (1) wholesalers; (2) other rectifiers; but the third class was to persons who would (3) "export out of the state," the liquors purchased. Neither the regulations, nor the Acts of the General Assembly, provided how the liquor should be exported out of the state. It was not required that it be shipped out of the state by a common carrier, as was required in the case of importations into the state.

But little, if any, of the liquor sold by appellant was shipped out of the state by a common carrier. Most, if not all, of it was transported out of the state in trucks or in automobiles by the purchasers directly from appellant's place of business. It was not, however, contended or shown that in any instance the purchaser, who transported the liquor out of the state, did not possess a license permitting him lawfully to dispose of the liquor purchased in the state to which he proposed to transport it. A bill-of-lading was prepared in connection with each sale, showing the destination of the liquor, after an affidavit had been executed by the purchaser showing

its destination and that it was to be exported out of the state, and that the purchaser possessed a legal permit to handle and sell the liquor in the state to which it was to be transported.

Such sales, *prima facie,* were perfectly legal. Rectifiers were given authority, both by the Acts 108 and 109, *supra,* and the regulations of the Commissioner of Revenues, to make such sales. The only tax imposed upon any sale which a rectifier may legally make, was 5 cents per gallon. There appears to be no authority in the law for the imposition of any greater or other tax against rectifiers.

By paragraph No. 6 of Supplemental Regulation No. 25, the Commissioner ordered that "No rectifier may sell liquors received into this state unless such liquors have been rectified, blended or mixed, by said rectifier, and unless a five cent tax has been paid thereon in accordance with paragraph No. 4," (copied above).

It is conceded that appellant did not rectify the liquor upon which the state now seeks to collect a tax of $3.36 per case of 3 gallons.

Upon the promulgation of this paragraph or Subrule No. 6, the appellant filed suit to enjoin its enforcement. The relief prayed was granted in the chancery court, and that decree was affirmed on the appeal therefrom to this court. *McCarroll, Commissioner of Revenues,* v. *Southwestern Distilled Products, Inc.,* 198 Ark. 729, 131 S. W. 2d 5. It was held in that case that the rectifier's right to sell liquor, conferred by § 14108, Pope's Digest, was not restricted or limited to liquor which he had, himself, rectified.

The case of *Southwestern Distilled Products, Inc.,* v. *Trimble, Judge,* 198 Ark. 970, 132 S. W. 2d 196, is not relied upon as being decisive of the amount of tax which a rectifier should pay, whether 5 cents per gallon or $1.12 per gallon. The opinion in that case recites that the petitioner in that case for a writ of prohibition (who is the appellant here) had not paid any tax on 8,877 cases of alcoholic liquor. This was a part of the liquor here involved. The liquor was seized and impounded for the

purpose of collecting the taxes due the state thereon, which the prosecuting attorney insisted was $1.12 per gallon, or $3.36 per case, and it was sought by prohibition to restrain the prosecution of that case. The question there involved and decided was not what amount of tax was due on the liquor, but, rather, whether the circuit court had jurisdiction of the suit to enforce the collection of such taxes as were due, none having been paid. We denied the writ, holding that the court did have jurisdiction. The court proceeded to exercise the jurisdiction which we decided it had, and rendered the judgment, from which is this appeal, holding that the tax was not 5 cents per gallon, but was $1.12 per gallon.

Under the facts, so far recited, the case appears to present no question of serious difficulty. There appears to be no law requiring a rectifier to pay any other or greater tax than 5 cents per gallon upon liquor which he sells as a rectifier to his restricted classes of customers. There is nothing in the law requiring him to purchase and place strip stamps upon the containers of the whisky. This is done by the wholesaler. The tax of $1.12 per gallon must be paid, when sold to retailers for domestic consumption, and its payment evidenced by placing the strip stamps on the containers of the liquor, but this is done by the wholesaler and not by the rectifier. If each were required to place the strip stamps on the containers of liquor, the tax would be twice collected, and the law expressly provides that duplicate taxes shall not be collected. Nor is there any law which requires the rectifier to place the strip stamps upon liquor which is exported from the state. If this were done, no dealer outside the state could afford to buy liquor from a rectifier in this state, for the reason that payment of the tax of $1.12 per gallon in this state would not relieve the liquor from any tax imposed by the laws of the state into which it was exported, and the rectifier here could not compete with rectifiers in other states.

It is, asserted, and not denied, that no state issuing rectifier's permits requires of the rectifier any payment except his license fee (which, in this state, is $1,500),

and the tax which is imposed upon such sales as he is authorized to make.

A careful study of Acts 108 and 109 leads us to the conclusion that it was not the intention of the General Assembly to require payment of a domestic tax of $3.36 per 3-gallon case except upon liquor sold and distributed by wholesalers in this state to licensed retailers in this state.

When sold by them to the retailer—and no one else may sell to the retailer who proposes to retail in this state—they (the wholesalers) are required to place, on the containers of the liquor strip stamps in the amount of $1.12 per gallon. No law contemplates or requires the rectifier to place the stamps on liquor they sell, because they have only three classes of customers. They may sell to wholesalers in this state, or other rectifiers, whose right to re-sell is subject to the same limitations as is his own. His other customer is he who purchases for export from the state, and no law required upon such sales the payment of the tax which the strip stamps evidence. It must be obvious that if this were required, no exporter would purchase from a rectifier in this state, for, after paying the domestic tax in this state, he would also be required to pay the domestic tax in the state to which he transported the liquor purchased in this state, that is, if he sold it legally in the state to which he transported it. The revenue features of the law which we are now considering relate to and deal with sales legally made. Other provisions of the law deal with infractions of the law. But this is not a criminal prosecution for the violation of the liquor laws. If appellant has violated the law, it will be held amenable in proceedings based on that conduct. The amount of tax which the rectifier may be compelled to pay does not depend upon his observance or violation of the law. A retailer might sell liquor to a minor, or otherwise violate the law; but his tax would not be increased on that account; he would be punished for violating the law.

The law, so far as here stated, appears to be clear, and not to be seriously disputed. The insistence is,

however, that appellant exceeded its powers under its rectifier's permit. The basis of this contention is that appellant sold liquors to persons who transported it for re-sale in dry territory, where liquor could not be sold except in violation of the law. One of the principal offenders in this respect was a licensed retail liquor dealer in Texas, who is designated—and, no doubt, properly so —as a "Rum Runner," meaning one engaged in the illicit sale of liquor. This dealer had dual license plates for his automobile in which he transported liquor from appellant's place of business in this state to both Texas, where liquor could be legally sold, and to Oklahoma and Kansas, where it could not be legally sold. The dealer would have his Texas license plates on his car when he appeared at appellant's place of business in this state to purchase liquor. He would, also, make affidavit that the liquor would be transported into Texas, although, in fact, its ultimate destination was either Oklahoma or Kansas, in neither of which states could liquor be legally sold. A bill-of-lading was issued upon the occasion of each purchase of liquor, showing its destination to be Texas, after an affidavit had been required of the purchaser that such was a fact. These bills-of-lading were made in triplicate, and copies thereof were furnished both the state and federal authorities, and records of all such sales were also made. These were for the inspection of state and federal authorities, and it appears that such records were examined by both at regular intervals.

The insistence is—and the court below apparently, but not expressly, found—that this was a mere subterfuge or fraudulent scheme by and under which liquor was sold by appellant for transportation into dry territory, and that appellant was aware of this fraud being practiced whereby laws of the dry states might be violated. However this may be, it appears certain, in fact, is undisputed, that all the liquor so sold was, in fact, transported out of this state, and that none of it was ever diverted into this state or purchased by any Arkansas dealer or other person in this state, nor was it contemplated that it would be. It is undisputed that the liquor was exported from this state only by persons holding a federal govern-

ment permit in the foreign state, and that person and those persons comprised one of the three classes of customers to whom rectifiers in this state may sell. It may be, and, no doubt, is true, as is very earnestly insisted, that it would encourage "Rum Running," so-called, and make it possible to violate the laws of dry states if liquors were sold to persons who intended to violate the laws of those states. Even so, appellant is shown to have made sales only to wholesalers, or other rectifiers, the legality of which sales is not questioned, and to persons who did, actually and in fact, export out of this state the liquor purchased from appellant.

If there was in fact a conspiracy between appellant and its customers to violate the federal liquor laws, or those of some other state, this would constitute an offense for which the conspirators might be prosecuted and punished. But such action does not affect the tax to be paid by appellant if the sales made by it were in fact authorized by law.

So far we have considered only the question of the tax which appellant may be required to pay under Acts 108 and 109. We have considered the question, under these acts, whether rectifiers are permitted to sell for export without paying the domestic tax. In the excellent and able brief filed on behalf of the state, the concession appears to have been made that appellant was and is liable, under Acts 108 and 109, only for a tax of 5 cents per gallon on the liquor. It is said in the brief that "If this premise is correct, then we must concede that appellant's theory of the case is correct, and for the sake of fairness, it may be noted in passing, that the original liquor act (108 of 1935) did make a provision for the export of liquor from this state. This provision is digested as § 14108, Pope's Digest. One would infer from the repeated use of the present tense in its argument along this line (appellant's brief, pp. 58-64) that appellant takes refuge in the language of the original liquor act, and remains in blissful ignorance of later enactments relative to sales of liquor at export."

This brings us to a consideration of the question whether there has been legislation so amending the law

as to change or increase the tax imposed by Acts 108 and 109 of 1935 upon persons holding rectifier's licenses.

The opinion in the case of *Southwestern Distilled Products, Inc., v. State, ex rel. Humphrey, Auditor,* 199 Ark. 761, 136 S. W. 2d 166, was delivered January 29, 1940. An examination of the record in that case discloses that it involved the tax due by the appellant company (which company is the appellant here) on liquors rectified at the West Memphis, Arkansas, plant of appellant between July 16, 1936, and June 14, 1939. The opinion contains no intimation that there is any statute applicable to the tax due by rectifiers later than § 4 of Act 109 of the Acts of 1935. The opinion quotes from that section the recital that "For the privilege of blending, rectifying, or mixing of any said spirits, and selling and transporting same, shall, in addition to the license fee tax provided by law, pay an excise tax of five (5) cents for each gallon of distilled spirits, blended and rectified or mixed, is hereby imposed; provided, however, that said license fee (5 cents) shall not be required to be paid for such distilled spirits used in blending, rectifying, or mixing." That opinion states that "The act is plain and unambiguous and required the rectifiers of liquor in this state to pay a tax of five cents per gallon on every gallon he rectifies, blends, or mixes, irrespective of what disposition he make of it." The laws of the state governing the taxes to be levied upon liquor fall in two categories: first, the law very evidently intended to provide for a tax of $1.12 per gallon upon liquor sold and consumed in this state, and: second, a tax of five cents (5c) per gallon upon liquor sold for export and for consumption elsewhere. The record in this case clearly shows that the sales upon which the trial court predicated its judgment were for export and it is not indicated that any part thereof was ever consumed in this state. In other words, the rectifier's tax was 5 cents per gallon, irrespective of the disposition made of the liquor.

We conclude, therefore, that the fact (which we assume to be true) that appellant's Sulphur Springs plant was located near the line of the dry state of Oklahoma and not very far from the line of the dry state of Kansas

for the purpose of enabling it to compete with rectifiers in Kentucky, Illinois and Missouri for the rum runner business in those dry states cannot have the effect of changing the amount of domestic tax due on such liquors so exported, even though the actual sale and delivery were made in Benton county, Arkansas. Appellee's concession that, unless the export provisions of Acts 108 and 109 have been repealed, he has no case, we think is a correct one, and we are of the opinion that such provisions have not been repealed. The Legislature of 1939, by Act 176, p. 414, did repeal part of paragraph (d) of § 5 of Act 18 of the Extraordinary Session of 1938, which provided for the taxation of liquors and wines held by wholesalers in this state for export out of the state at the rate of 60 cents per case of 3 gallons of liquor and 30 cents per case of 3 gallons of wine except native wine. Only wholesalers licensed by this state and the federal government were permitted to receive such liquors for storage and sale or delivery outside this state and they were permitted to sell only to licensed wholesalers outside this state and to duly licensed retailers in this state. As to retailers duly licensed in this state, one paragraph of said sub-section (d) provided: ''Such liquors received under the paragraph next preceding by a retail dealer licensed under the laws of this state shall be kept separate and apart from other liquors in his possession and shall not be offered or sold by him for consumption in this state.''

It was these provisions of said Act 18, including the power granted the Commissioner of Revenues to make rules and regulations, and the penalty provisions for violations, that the Legislature repealed by Act 176 of 1939. The emergency clause of said Act 176 recited that the ''principles of the so-called sale of liquor at export are against public policy and that the state of Arkansas is losing large sums of money in the form of taxes upon the sales of liquor 'for export'.'' Therefore, an emergency was declared. The sale of these liquors by retail dealers was the principal cause of the trouble. While such sales were made in case lots by retailers presumptively for export, it was well known that much of it was for domestic consumption, on which the tax of 60 cents

a case was paid instead of $3.36 per case. Act 176 of 1939 repealed this method of handling liquor for export, but it did not repeal the export provisions of Acts 108 and 109. For instance in art. III, § 3, sub-section (c) it is provided: "A distiller or manufacturer may, under such rules as may be adopted by the Commissioner of Revenues, sell, deliver or transport only to (1) wholesalers, (2) rectifiers, (3) export out of the state"; and, by sub-section (b) of § 4 of said article a rectifier may sell to wholesalers, other rectifiers, and export out of the state. The taxes to be collected are fixed in said Act 109 as hereinbefore stated. None of these provisions are repealed by said Act 176 or any other act to which our attention has been called. If the manufacturer or rectifier had to pay the domestic consumption tax in this state, then there would be no such businesses as they could not sell outside the state where another consumption tax would have to be paid if sold legally.

It is the province of the Legislature to determine the rate of taxes to be assessed and the duty of the courts to determine the legislative meaning. It is beyond the power of the court to change the legislative intention of taxing liquor for export at the rate of 5 cents per gallon unless other acts of the Legislature provide for such a basis of taxation under proven circumstances. We do not find that any circumstances established in the record of this case justify holding the tax to be other or greater than 5 cents per gallon.

The question of the guilt or innocence of those engaged in the business undertaking out of which this litigation has arisen has no place in determining the conclusion of this court. No questions of penalty or punishment are involved. In fact, the question of their guilt or innocence has now been determined elsewhere by a court having proper jurisdiction.

Since, as we have shown, all taxes due this state have been paid, the judgment is reversed and the cause dismissed.

GREENHAW, J., disqualified.

GRIFFIN SMITH, C. J., (dissenting). The circuit court found as a matter of fact that from April 1 to October 17, 1939, Southwestern Distilled Products, Incorporated, sold 275,315.19 proof gallons of alcoholic and spirituous liquors.

Deliveries were from a place maintained at Sulphur Springs, and the sales ". . . were at wholesale and retail to buyers holding no legal permits to handle such liquors in any manner in Arkansas."

Section 1 of Act 393 of 1939 imposes taxes. aggregating $1.12 per gallon on liquor *sold or offered for sale in the state.* In each instance the separate taxes mentioned are declared to be due on the sales indicated.

As shown by the majority opinion, a tax of five cents per gallon is payable by rectifiers, who may dispose of their wares *only* by selling to another rectifier, by selling to a wholesaler, or by selling for export.

James Cole, manager of the so-called rectifying company, testified that, after April, sales increased ". . . from 600 to 700 cases [of three gallons each] per day." He also testified that the profit was ". . . about $1.25 a case." If the average between 600 and 700 cases should be accepted as the correct figures—that is, 650 cases—the daily "take" as profit was $812.50 at that time.

There was no rectifying plant at Sulphur Springs. The entire set-up was dummy for the patent purpose of engaging in the bootlegging business in response to Oklahoma and Kansas thirst.

Automobiles and trucks utilized the roads and competed for parking space where a group of employes—some of whom were hoodlums with a machine gun and pistols—waited upon the "trade."

The only inference to draw from testimony (and this court does not seem to be in disagreement as to the facts) is that fraudulent orders were presented, and that Cole and his associates had full knowledge of the evasive tactics. Automobiles carried duplicate license plates to deceive any diligent officer who might have a curiosity regarding the "business" in hand. After eight

months, machinery suitable for use in rectifying liquors was acquired at a cost of $619. Defiance of law and disregard of decency became open, flagrant, notorious.

I cannot read the record and come to any conclusion other than that the enterprise was conceived and perpetuated as a gigantic fraud—a masterpiece of business engineering from the time bids were made for illegal business by way of motive conduits to Oklahoma and Kansas until Prosecuting Attorney John K. Butt and Circuit Judge J. W. Trimble courageously concluded that the farcical transactions should end. It appears certain to me that the state was corruptly circumvented in the enforcement of its laws by pretexts but thinly veiled.

To say that anyone connected with the distilling company believed the rum-runners from Texas were citizens of that state, or, if they were, that the liquor sold at wholesale at Sulphur Springs was intended for use of the camouflaged customers, is to plead guilty to reasoning seldom accepted by a judicial tribunal.

In less than seven months approximately a million dollars worth of whiskey was put in trucks and automobiles at Sulphur Springs. Manager Cole (in respect of whose finesse Pendergrast of Kansas City fame would be envious) is authority for the statement that ''. . . the sales were made in Benton county.''

A rectifier may sell at wholesale. That is exactly what Southwestern did. Act 393 requires (let it be repeated) that a tax of $1.12 be paid *for every gallon sold or offered for sale in this state.* The majority opinion holds, in effect, that Southwestern could not engage in the bootlegging business if it were required to pay the state tax; that ''customers'' would purchase in other states, and that Arkansas would lose the revenue. What revenue? may we ask. An answer is that this income about which so much has been said is five cents a gallon —the equivalent of $14,000 for about 4,404,040 drunks, assuming half a pint for each jag.

It is true, of course, that courts do not make the laws. But when the manager of a distilling company admits from the witness stand that he sold more than two hun-

dred and seventy-five thousand gallons of liquor in *Benton county,* and when size of the sales shows conclusively that the transactions were at wholesale, and when the law permits a rectifier to sell at wholesale and assesses a tax of $1.12 per gallon, how can it be said that the general assembly did not intend the tax should be paid?

Southwestern is now free to proceed with its immoral intercourse with the underworld. The state taxing agencies are impotent to interfere. Legislative "intent," we are told, was not to molest these purveyors of corruption and dealers in vice: it would be "technical" to say that Act 393, in assessing a levy of $1.12 per gallon *on all liquors sold in this state,* included the contraband in question.

Emphatically, I do not subscribe to such doctrine; nor should the law be construed so as to defeat its own ends.

MR. JUSTICE HUMPHREYS and MR. JUSTICE HOLT concur in this dissent.